David L. Harris
Stephen M. Plotnick
**LOWENSTEIN SANDLER PC**
65 Livingston Avenue
Roseland, New Jersey  07068
973.597.2500

Ruth Lowenkron
**EDUCATION LAW CENTER**
60 Park Place, Suite 300
Newark, New Jersey  07040
973.624.1815

Sarah W. Mitchell
Joseph B. Young
**NEW JERSEY PROTECTION
    & ADVOCACY, INC.**
210 South Broad Street
Trenton, New Jersey  08608
609.292.9742

Michaelene Loughlin
**LOUGHLIN & LATIMER**
131 Main Street
Hackensack, New Jersey  07601
201.487.9797

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEW JERSEY PROTECTION AND ADVOCACY, INC., the EDUCATION LAW CENTER, the STATEWIDE PARENT ADVOCACY NETWORK OF NEW JERSEY and THE ARC OF NEW JERSEY,<br><br>Plaintiffs,<br><br>-v- | Civil Action No.<br><br><br>**COMPLAINT** |

NEW JERSEY DEPARTMENT OF
EDUCATION, NEW JERSEY STATE BOARD
OF EDUCATION, LUCILLE E. DAVY, in her
official capacity as Commissioner of the New
Jersey Department of Education, ARNOLD G.
HYNDMAN, ARCELIO APONTE, RONALD K.
BUTCHER, DEBRA ECKERT-CASHA, MAUD
DAHME, KATHLEEN A. DIETZ, JOSEPHINE
E. HERNANDEZ, FREDERICK H. LAGARDE,
JR., ERNEST LEPORE, THELMA NAPOLEON-
SMITH, EDITHE FULTON and KENNETH J.
PARKER, in their official capacities as members
of the New Jersey State Board of Education,

                    Defendants.

---

Plaintiffs NEW JERSEY PROTECTION AND ADVOCACY, INC., 210 South Broad Street, 3rd Floor, Trenton, New Jersey 08608; the EDUCATION LAW CENTER, 60 Park Place, Suite 300, Newark, New Jersey 07102, the STATEWIDE PARENT ADVOCACY NETWORK OF NEW JERSEY, 35 Halsey Street, 4th Floor, Newark, New Jersey 07102; and THE ARC OF NEW JERSEY, 985 Livingston Avenue, North Brunswick, New Jersey 08902, by and through their undersigned attorneys Lowenstein Sandler PC, the Education Law Center, New Jersey Protection & Advocacy, Inc. and Loughlin & Latimer, allege as follows:

## PARTIES

### A.  The Plaintiffs

1.     Plaintiff New Jersey Protection and Advocacy, Inc. ("NJP&A"), a non-profit corporation, is the federally funded agency designated since 1994 to serve as New Jersey's protection and advocacy system for people with disabilities.  Pursuant to this designation, NJP&A serves as the agency to implement, on behalf of the State of New Jersey, the following programs: Protection and Advocacy for Individuals with Developmental Disabilities, 42 U.S.C. §§ 15041–15045, Protection and Advocacy for Individuals with Mental Illness, 42 U.S.C. §§ 10801–10851, and Protection and Advocacy of Individual Rights, 29 U.S.C. § 794e.  NJP&A has

the statutory authority to pursue legal, administrative, and other appropriate remedies to protect and advocate for the rights and interests of people with disabilities.  Specifically, NJP&A brings this action on behalf of children with disabilities who were assigned or designated for assignment to educational placements that are not in the least restrictive environment.  These individual children have each suffered injuries, or will suffer such injuries, that would allow them to bring suit against the Defendants in their own right.  NJP&A is a party as well as co-counsel in this matter.

2.    Plaintiff Education Law Center ("ELC") has a contract with NJP&A to provide protection and advocacy services for children with disabilities in northern New Jersey who experience difficulties obtaining an appropriate education.  Since its founding in 1973, ELC has acted on behalf of disadvantaged children and children with disabilities to achieve education reform, school improvement, and protection of individual rights through research, public education, technical assistance, advocacy, and legal representation.  In addition to serving as lead counsel to 300,000 urban school children who are the plaintiffs in New Jersey's school funding case, *Abbott v. Burke*, ELC provides a full range of direct legal services to parents involved in disputes with public school officials.  In addition to its docket of law reform cases, ELC serves approximately 400 individual clients each year, primarily in the area of special education law.  ELC is a party as well as co-counsel in this matter.

3.    Plaintiff Statewide Parent Advocacy Network of New Jersey ("SPAN") is New Jersey's federally-funded Parent Training and Information Center pursuant to 20 U.S.C. § 1482.   SPAN provides training and technical assistance to over 30,000 parents and professionals each year, on issues such as special education, school reform, rights of homeless and immigrant children, bilingual services, discipline and positive behavioral supports, parent involvement, and parent-professional collaboration.

4.    Plaintiff The Arc of New Jersey ("The Arc")  is the largest statewide advocacy organization for individuals with intellectual and other developmental disabilities and their families.  The Arc of New Jersey was  founded in 1947 by a group of parents, with the

mission of enhancing the quality of life of children and adults with intellectual and developmental disabilities and their families through advocacy, empowerment, education, and prevention.  In addition to the statewide office, The Arc has twenty local county chapters and is affiliated with The Arc of the United States.  The Arc serves over 18,000 member families statewide, and advocates on behalf of more than 200,000 individual with developmental disabilities in New Jersey.  Through the Department of Education Advocacy, The Arc assists its member families in obtaining appropriate educational services.  Since 1991, it has been The Arc's formally adopted policy position that "students with disabilities have the right to attend the same neighborhood schools, classrooms, extra-curricular and recreational activities and community programs as they would if they did not have a disability," and "students with disabilities belong in age-appropriate integrated environments and/or classrooms with peers who are not disabled."

B.      **The Defendants**

5.      The New Jersey Department of Education ("NJDOE") is the state agency established to supervise the provision of public education to children in New Jersey, and is the "state educational agency" established to oversee the provision of special education services to children with disabilities in New Jersey pursuant to the Individuals with Disabilities Education Improvement Act of 2004, 20 U.S.C. § 1400 *et seq*. ("IDEA").  NJDOE receives federal funds under IDEA.  Its offices are located at 100 Riverview Plaza, Route 29 in the City of Trenton, County of Mercer, State of New Jersey.

6.      The New Jersey State Board of Education is charged with the general supervision and control of NJDOE, as well as the general supervision and control of public education in New Jersey.  Its offices are located at 100 Riverview Plaza, Route 29 in the City of Trenton, County of Mercer, State of New Jersey.

7.      Lucille E. Davy is the Commissioner of Education in the State of New Jersey.  Davy serves as New Jersey's chief executive school officer and as Secretary to the State Board of Education.  New Jersey's special education statute, N.J.S.A. 18A:46-1 *et seq*., grants

the Commissioner a broad range of power and responsibilities, and any decisions made by the Commissioner have the force of law.  As the education leader of the state, the Commissioner's responsibilities include recommending legislative initiatives and changes; conducting educational initiatives; promulgating regulations; ensuring that local school districts adhere to all legal requirements relating to school district operation; and apportioning state aid to local districts.

        8.     Arnold G. Hyndman, Arcelio Aponte, Ronald K. Butcher, Debra Eckert-Casha, Maud Dahme, Kathleen A. Dietz, Josephine E. Hernandez, Frederick H. LaGarde, Jr., Ernest Lepore, Thelma Napoleon-Smith, Edithe Fulton, and Kenneth J. Parker are members of the New Jersey State Board of Education.  Their responsibilities pursuant to N.J.S.A. 18A:4-3 *et seq.* include the general supervision and control of public education in the state by setting the rules needed to implement state education law; adopting and implementing strategic plans for conducting and improving public education in New Jersey; reviewing educational policies proposed by the Education Commissioner; and adopting an administrative code that contains the rules for implementing education laws.

### PRELIMINARY STATEMENT

        9.     This is an action to enjoin the NJDOE and the State Board of Education and their employees and members from violating the rights of children with disabilities to receive a "free appropriate public education" in the "least restrictive environment."  It is brought by agencies acting pursuant to federal protection and advocacy statutes on behalf of children with disabilities and their parents, and by statewide advocacy organizations, to redress Defendants' violations of the Individuals with Disabilities Education Act, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"), and other relevant laws, which require:

        (a)     that each child receive a "free appropriate public education" ("FAPE");

        (b)     the development of an appropriate Individualized Educational Program ("IEP") for each child that confers real educational benefits;

(c)     the provision of supplemental aids and services to children with disabilities;

(d)     educating children with disabilities in the "least restrictive environment" ("LRE") that is, to the maximum extent, appropriate and with children who do not have disabilities;

(e)     the participation in academic and non-academic programs by children with disabilities to the same extent that their non-disabled peers participate, and alongside their non-disabled peers;

(f)     attendance in the neighborhood school the child would have attended if s/he did not have a disability;

(g)     the establishment of a "continuum of placements" for children with disabilities;

(h)     the abolition of funding formulas that impede inclusion of children with disabilities;

(i)     comprehensive personnel development in general and special education;

(j)     professional licensure standards that mandate training in special education for all teachers;

(k)     State provision of technical assistance and training to districts in the provision of inclusive education services;

(l)     State monitoring of district compliance with federal and state education laws and timely correction of noncompliance; and

(m)     the development of school facilities that enhance inclusion of children with disabilities.

10.     As a result of Defendants' failures, countless children with disabilities have been denied an appropriate education.   Children with disabilities are unnecessarily segregated and denied their right to be educated with children who do not have disabilities, to the

maximum extent appropriate.  Some children with disabilities are placed in general education classrooms, but are denied aids, services, and accommodations needed to receive an appropriate education, and many children are not even placed in general education classrooms.

11.     Plaintiffs seek injunctive relief to compel Defendants to include children with disabilities, ages 3-21, to the maximum extent appropriate, in general education classrooms, with appropriate aids, services, and accommodations.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to (a) 20 U.S.C. § 1415(i)(2) in that claims are asserted under IDEA, (b) 29 U.S.C. § 794(a)(2) in that claims are asserted under Section 504 of the Rehabilitation Act, (c) 28 U.S.C. § 1331 in that claims are asserted under the laws of the United States, and (d) 28 U.S.C. § 1343 in that claims are asserted under laws providing for the protection of civil rights.  Declaratory relief is sought pursuant to 28 U.S.C. § 2201 *et seq*.  Plaintiffs' causes of action arise under 20 U.S.C. § 1401 *et seq*., and 29 U.S.C. § 794.

13.     This Court has personal jurisdiction over Defendants in that they are residents of the state.

14.     Venue in this district is proper under 28 U.S.C. § 1391(b) as the matter arose in this district and all of the parties reside in this district.

## STATEMENT OF FACTS

15.     N.B. is just one of many children who have been denied an appropriate education by Defendants.  N.B. was classified at age three as "preschool disabled."  Formal and informal assessment indicated that his cognitive functioning fell in the low average to average range, with receptive/expressive language and fine and gross motor skill delays.  N.B.'s initial IEP team placed him in a preschool for typically developing children and provided related services.  After moving, the new district offered a placement in the district's "preschool disabled" program.  N.B.'s parents were told that the district did not have a general education program for preschoolers.  The district refused the parents' request to place N.B. in a private

preschool for typically developing peers, as authorized by IDEA.  The parents filed a due process petition seeking placement in a general education program and related services.  As a result of an emergency application, the district provided related services.  The parents retained counsel and the case was eventually settled with partial reimbursement of tuition for the private general education preschool.  For the following school year, despite evidence that N.B. was benefiting from his inclusive education, the district again offered placement in the "preschool disabled" program.  Once again, the parents accepted partial reimbursement of tuition for their private placement.

      16.    F.P. has a profound hearing impairment and has resulting speech and language delays and fine motor delays.  She was referred for special education services by the Early Intervention Program at age three.  Without the benefit of an evaluation, the district's representative told F.P.'s mother that F.P. would not qualify for classification as "preschool disabled."  F.P.'s parents enrolled her in a private preschool for typically developing peers where she did well, and F.P's parents provided her with private speech/language therapy.  Upon attaining age five, F.P. was evaluated by the district's child study team, which recommended classifying her in the category of "multiply-disabled" and offered her placement in a "multiply-disabled," segregated class for all instruction, including gym.  Based on her experience in preschool and the advice of experts working with F.P., her parents retained counsel and filed a petition for due process challenging both her classification and placement.  The district agreed to change her classification to "auditorily impaired" and place her in a general education kindergarten with supplemental aids and services.  For first grade, the parents requested in-class supports for language.  The child study team provided, instead, replacement resource room, telling the parents that the district did not offer inclusion unless so ordered by the courts.

      17.    K.A. was found eligible for special education and related services at age four on the basis of "preschool disabled."  She was reclassified before entering kindergarten on the basis of "communication impaired."   From kindergarten through second grade, the district placed her in general education classes with a one-on-one aide, speech/language therapy, and

occupational therapy.  While she was in second grade, K.A.'s family moved.  During third grade, the new district proposed to place her in pull-out resource room for reading, language arts, and math.  Her parents objected to her removal from the general education classroom, retained counsel, and filed a petition for due process, contesting the restrictive placement.  During settlement negotiations, the district was so adamant about removing K.A. from the general education classroom that her parents believed that, even if they won the due process hearing, K.A. would lose.  The parents moved to yet another district in order to obtain an inclusive placement, and, in fact, obtained one.

18.     F.V., classified with a high functioning pervasive developmental disorder ("PDD"), was placed in an integrated classroom and received pull-out resource room services through second grade.  As of third grade, the district placed F.V. in a segregated autism classroom.  Although F.V. is included with peers for specials, such as art and music, the family is concerned that this does not provide F.V. with sufficient opportunities to learn from, or socialize with, peers -- which is vital for a child with PDD.  Additionally, the family was advised, when they agreed to the current placement, that the special education teacher for the autism class would be trained in the Preventing Academic Failure ("PAF") reading program.  However, when the family asked about the PAF program, the teacher was unaware the district had promised this service.  Finally, the family was assured that an applied behavioral assessment would be performed to assess F.V.'s social behavior.  F.V.'s family has requested the assessment be administered, but the district has yet to schedule the administration.  The family continues to advocate for these services, while taking a cautious wait-and-see approach with the segregated placement.  The family would prefer for F.V. to stay at his neighborhood school, but contemplate whether their son can be educationally successful in a public school that constantly has to be reminded to carry out the services it is legally required to perform.

19.     T.G. was classified for special education services in second grade based upon a reading disability.  She remained in the general education classroom, but received pull-out resource room services for reading.  As the only second grader in the resource room, she was

given independent "ditto" work, while the teacher assisted fifth graders.  T.G. was provided with only approximately twenty sessions of one-on-one remedial reading during the second grade.  In third grade, the school district wanted to move T.G. to a segregated classroom, as she could not read independently.  T.G.'s mother requested that T.G. remain in general education, but receive an in-class aide who could help her with her reading difficulties.  T.G.'s family was told there were no funds available for in-class support.  One month into third grade, she was moved to a segregated classroom with students of multiple ages and disabilities.  T.G. reported to her mother that the segregated class moved at a slower-pace, did not give her sufficient exposure to science and social studies, and that she did not receive positive grade-level appropriate interactions with her classmates in this setting.  Moreover, the segregated classroom did not offer any one-on-one remedial reading services during the school day.  After multiple requests from T.G.'s mother, the district agreed to provide T.G. with remedial reading instruction.  However, T.G. received only four (after-school) sessions during her entire third grade year.  This past summer, T.G.'s family enrolled T.G. in a private tutoring program to help remediate her reading disability.  T.G. began fourth grade in 2006 in a completely segregated classroom environment.  However, after T.G.'s mother retained counsel, the school district included T.G. for science and social studies.  After extensive intervention, T.G. finally, at the end of the year, obtained an aide to support her in these integrated classes and for additional integrated classes.

20.    In 2005, although New Jersey accounted for only 3.8% of the children ages 6 to 21 in the United States receiving special education services, 9.0% of all segregated placements[1] nationally are for such children in New Jersey.

21.    In 1993, 8.9% of New Jersey's children ages 6 to 21 classified as eligible for special education were in segregated placements.  In 2004, data supplied by the U.S. Department of Education showed that this percentage had *increased* to 9.6%, compared to a

---

[1]    "Segregated placements" include: separate public facilities, separate private facilities, public residential facilities, private residential facilities, homebound/hospital environments.

national average of 4%, with no other state having even as many as 8% of their students in segregated placements, and twenty-six states having less than 3% of their students in segregated placements. Data posted by the New Jersey Department of Education show even higher rates of segregation. For the years 2002 through 2005, children eligible for special education services placed in segregated placements consistently equaled or exceeded 10% (10.3% in 2002, 2003, and 2004; 10% in 2005).

22.     In 2004, 21,848 New Jersey children with disabilities were assigned to segregated placements. Only New York and California, with significantly larger populations, had more children in segregated facilities than New Jersey, but their percentage of children with disabilities in segregated settings was far smaller: 7% and 4.3% respectively.

23.     The data are similar for children ages 3 through 5 in preschool programs. Almost 10% (9.96%) of New Jersey's preschool students receive educational services in a separate school, compared to an even lower national average of 2.86%. Of the 39 states reporting placement in segregated schools, only two other states (Arkansas and Delaware) have a greater percentage of preschool students in these schools.

24.     Considerably more students classified with mental retardation in New Jersey (73.4%) spend more than 60% of the school day outside a general education classroom or in a segregated placement than nationally (56.8%). Similarly, 56.7% of the students with a classification of emotional disturbance spend more than 60% of the school day outside a general education classroom or in a segregated placement compared to 45.6% nationally.

25.     Minority children are particularly affected by these segregation practices. While comprising 17.7% of the total public school enrollment in 2004, African-American children accounted for 22% of the students classified for special education services, and 32.8% of the students in segregated placements. African-American children are also classified at a greater rate in those classifications that yield a higher percentage of segregated placements. African-American children are classified as having mental retardation at almost four times the rate of white children (0.98% v. 0.25%), and are classified as having multiple disabilities

(3.48%) and emotional disturbance (1.76%) at approximately twice the rate of white children (1.71% and 0.73% respectively).  More than half of white children classified as eligible for special education services (50.9%) spend more than 80% of their school day in a general education classroom, while only 26% of African-American students and 32% of Latino students spend more than 80% of their school day in a general education classroom.  Similarly, more than twice the percentage of African-American (28.15%) and Latino (26.47%) children eligible for special education services spend less than 40% of the school day in a regular classroom compared to white students (11.41%).

26.     If New Jersey approached the national average for segregated placements for all children classified as eligible for special education services, almost 13,000 fewer children would be in segregated placements.

27.     The State's Performance Plan holds little promise for redressing this situation within the educational lifetime of today's students.

28.     The State's 2005 Performance Plan (resubmitted February 2007) demonstrates that in the 2003-2004 and 2004-2005 school years, only 9% of preschool children with disabilities were educated in settings with nondisabled peers.  Over the next six years, the Plan still provides that less than half (40%) of preschool children will be educated in settings with nondisabled peers.

29.     According to the State's 2005 Performance Plan (resubmitted February 2007), during the three school years between 2003 and 2005, 10.3% of public school students with disabilities, ages 5 through 21, were educated in segregated settings (separate public or private schools, residential placements, homebound instruction or hospital placements) which is significantly higher than the national average of approximately 2.9%.  The Plan merely targets a reduction of a 2.3 percentage points (from 10.3% to 8%) over the course of six years.

30.     In general education classes, where children with disabilities are exposed to the general curriculum and interact with nondisabled peers, children with disabilities receive

considerable academic and non-academic benefits. "Inclusion"[2] places children with disabilities in age-appropriate general education classes that offer a richer educational environment than do segregated special education settings. These general education classes offer activities that are more challenging and engaging, stimulate creativity, and place higher expectations for achievement. Benefits to children with disabilities include improved language development, improved reading skills, higher grades, higher scores on standardized tests, role modeling, larger friendship networks, improved attendance, and higher self-esteem. On the other hand, many segregated special education settings include rote and mechanical instruction and set low expectations for children with disabilities. In these settings, teachers are often overwhelmed by the presence of many children with disparate challenging needs, forcing the teachers to teach to the lowest common denominator or to only a limited number of children in the classroom as a result of the clustering of children with extremely diverse needs.

31.     Non-disabled children also experience great benefit from the inclusion of children with disabilities in the classroom, with no significant negative effects. The reading and mathematics performance of non-disabled children educated in inclusion placements has been shown to be substantially better than that of their non-disabled peers who were educated in segregated placements. Non-disabled children educated alongside their peers with disabilities also demonstrate social and developmental benefits, including improved attitudes towards, and relationships with, children with disabilities.

32.     Merely placing children with disabilities in general education classes without effective services and support, can lead to great harm. For example, children with disabilities who receive no accommodations, cannot meet teachers' expectations, and risk failure and loss of opportunity to master needed skills. In addition, children with disabilities are often

---

[2]     Education of children with disabilities in general education classes with supplementary aids and services is often termed "inclusion." "Inclusion" today differs from the once synonymous "mainstreaming," which now refers to merely placing a student with a disability in a general education classroom without modification or support and requiring the student to meet the same curricular expectations as the students without disabilities in the class.

punished with loss of recess, points, school parties and other activities.  They are retained because of failing grades or are promoted without obtaining any educational benefit.

33.    The United States Department of Education, Office of Special Education Programs ("US-OSEP") has cited Defendants for their failure to supervise, train, monitor, and ensure that school districts implement LRE requirements and correct widespread practices that violate the rights of children with disabilities to be educated in the LRE, including, but not limited to:

(a)    failing to ensure that children are removed from the regular education environment, only when, even with the use of supplementary aids and services, the nature and severity of the children's disabilities require it;

(b)    failing to ensure that each student with a disability who is removed from the general education classroom participates, to the maximum extent appropriate, in nonacademic and extracurricular activities with their nondisabled peers;

(c)    failing to provide a full continuum of placements for children with disabilities;

(d)    failing to provide services in general education settings to enable children with emotional disturbance to remain in the public schools;

(e)    placing children with mental retardation in out-of-district segregated settings, in-district segregated classes, and/or in isolated areas of the school building;

(f)    moving children with disabilities in a group from class to class, thereby reducing their interaction with nondisabled peers;

(g)    placing the majority of children who are returned from out-of-district placements in segregated in-district settings, with little or no opportunity for interaction with nondisabled peers;

(h)    failing to ensure that all district personnel are trained in effective inclusion practices;

(i)    failing to compel school districts to comply with IDEA; and

(j)      failing to aggressively monitor districts.

34.      The deficiencies cited by US-OSEP in the paragraph above persist.

35.      Parents who wish their children with disabilities to receive an inclusive education face long and costly due process proceedings or feel forced to move out of the district.

36.      Many children with disabilities are denied their right to obtain an inclusive education due to their economic status and geographic location.

37.      Many children with disabilities do not receive a FAPE.

38.      Many children with disabilities do not receive IEPs that confer real educational benefits.

39.      Many children with disabilities do not receive appropriate supplemental aids and services or accommodations from their school district.

40.      Many children with disabilities are frequently not afforded the opportunity to participate in academic and extra-curricular programs to the same extent as, and alongside, their non-disabled peers.

41.      Many children with disabilities do not attend the neighborhood schools they would have attended if they did not have a disability; nor do they attend school with the peers they would have attended with if they did not have a disability.

42.      The State has failed to ensure that districts establish a full "continuum of placements" for children with disabilities, starting with full inclusion in the general education classroom with nondisabled peers.

43.      The State has failed to provide sufficient, effective technical assistance and training to districts in the provision of inclusive education services.

44.      The State has failed to sufficiently and effectively monitor district compliance with the LRE mandate and has failed to ensure the timely correction of noncompliance once identified.

45.      The disproportionate number of children with disabilities educated in segregated settings is facilitated by the large number of public and private "receiving schools,"

regulated by Defendants pursuant to N.J.A.C. 6A:14-7.1 *et seq.* NJDOE is responsible for approving the establishment of new public and private receiving schools, pursuant to N.J.A.C. 6A:14-7.2, and approving and monitoring programs of receiving schools, including those in public facilities operated by:

        (a)    New Jersey's ten county educational services commissions, pursuant to N.J.S.A. 18A:6-51 through 70;

        (b)    New Jersey's eight county special services school districts, pursuant to N.J.S.A. 18A:46-29 through 46;

        (c)    New Jersey's two jointure commissions, pursuant to N.J.S.A. 18A:46-25 through 28;

        (d)    New Jersey's eleven regional day schools, pursuant to N.J.S.A. 18A:7B-1;

        (e)    the Marie H. Katzenbach School for the Deaf, pursuant to N.J.S.A. 18A:61-1 through 5; and

        (f)    New Jersey's five public college-operated programs for children with disabilities, pursuant to N.J.A.C. 6A:16-9.1.

        46.    In all, these public entities operate approximately 200 public facilities in the State for children with disabilities. While NJDOE's 2005 Performance Plan Proposes to reduce the percentage of students educated in segregated settings, plans are underway for construction of new segregated facilities in Middlesex and Burlington Counties and expansion of a segregated facility in Middlesex County.

        47.    Pursuant to N.J.A.C. 6A:14-7.1 *et seq.*, NJDOE approves and monitors 175 in-state private schools which exclusively serve children with disabilities and are authorized to receive children with disabilities under N.J.S.A. 18A:46-14(g). While NJDOE's 2005 Performance Plan proposes to reduce the percentage of children educated in segregated settings, NJDOE approved six new private schools since July 2000.

48.    In addition to having approved the segregated pubic and private schools set forth above, NJDOE routinely approves programs located in local public schools which entirely  segregate children with disabilities from their non-disabled peers.  There are no specific statistics  kept regarding the number of students who are segregated in-district for 100% of the school day as statistics regarding these children are included in the category of students who are segregated in-district 60% or more of the school day.

49.    The regulations promulgated by NJDOE do not include, among the criteria for approval, the effect of new receiving schools on the provision of education to children with disabilities in the least restrictive environment.  *See* N.J.A.C.  6A:14-7.2.

50.    State funding formulas in New Jersey impede the mandated inclusion of children with disabilities, as follows:

(a)    The state agency may use funds for "implementing a placement neutral cost sharing and reimbursement program of high need, low incidence, catastrophic, or extraordinary aid to local educational agencies that provides services to high need students."   20 U.S.C. § 1411(e)(3)(G).

(b)    Pursuant to 20 U.S.C. § 1411(e)(3)(G), the State makes funding available for districts that expend more than $40,000 per year for an individual child with a disability.  These "extraordinary aid funds" have only been available since the 2002-2003 school year—on a sliding scale.  Although as of the 2005-2006 school year, 100% of the per student costs in excess of $40,000 may be recouped by the district, N.J.S.A. 18A:7F-19(b), in fact the Legislature has allocated only $52 million of extraordinary funds which cover less than 30% of the extraordinary aid need.

(c)    Although N.J.S.A. 18A:7F-19(b) is neutral on its face, Defendants interpret extraordinary aid to be unavailable to reimburse a district spending over $40,000 on a child educated in-district for the following costs: professional development for general or special educators; consultation time between general and special educators, facility improvement and/or modification; supervision of general and special educators; and cost of child study teams.  For

children sent to out-of-district placements that cost over $40,000, however, these costs are included in the calculation of tuition, and Defendants reimburse these costs. Moreover, the State fails to provide sufficient information to districts on how to access extraordinary aid funds for students educated in in-district inclusive settings.

(d)     The State has admitted that over 90% of extraordinary aid funding in New Jersey is spent to send children with disabilities to out-of-district placements.

(e)     Numerous educational service commissions and special services school districts operate segregated schools, classes and/or programs for children with disabilities with tuition funding from the local districts, and additional funding from the counties—funds that the State does not mandate be equally available to districts to provide inclusive services.

51.     The State Board of Education has not adopted regulations that require it to consider the impact on the least restrictive environment mandate of the following entities that provide segregated services: educational service commissions, special education school districts, jointure commissions, regional day schools, the Marie H. Katzenbach School for the Deaf and public college-operated programs for children with disabilities.

52.     The State approved district Long Range Facilities Plans that include models for school facilities that impede the inclusion of students with disabilities.

53.     The State denied district applications for additional aid for "nonconforming spaces" which would allow children with disabilities to be included in general education programs.

54.     The State failed to ensure that districts do not send children with disabilities out-of-district due to space considerations, and failed to ensure that districts do not relegate services for children with disabilities to sub-par facilities, all of which force children with disabilities to bear the brunt of the districts' limited space problems.

55.     Defendants have failed to implement professional licensing and teacher standards to ensure appropriate training and education for educators regarding their obligations

to provide children with disabilities a free appropriate public education in the least restrictive environment.

56.     The standards, requirements, and obligations developed by the State Boards of Education and Examiners concerning the preparation, licensure and professional development of educators do not ensure that all educators have even fundamental training, understanding and knowledge of the importance, and obligation to ensure, that children with disabilities receive a free appropriate public education in the least restrictive environment.

57.     For example, all teaching staff members employed by a district board of education are required to "hold a valid and appropriate certificate."  N.J.A.C.  6A:9-5.1(a). However, none of the standards, requirements, and obligations associated with obtaining and maintaining "a valid and appropriate certificate" require that educators have any specific education or training associated with the obligation to ensure that children with disabilities receive a free appropriate public education in the least restrictive environment.

58.     Similar deficiencies exist in connection with educators' professional development obligations, which require all active teachers "to complete 100 clock hours of State-approved professional development every five years."  N.J.A.C. 6A:9-15.2(a).  Although the "content of each teacher's professional development" must "align with the Professional Standards for Teachers," there is no requirement that all teachers' professional development include appropriate training and education regarding the obligation to provide children with disabilities a free appropriate public education in the least restrictive environment, or appropriate training and education regarding effective inclusive education practices.  Only a small number of school districts have trained their personnel in inclusive practices.

59.     Although New Jersey receives a personnel development grant under Part D of IDEA, the State fails to ensure compliance with the requirements for this grant, thereby failing to provide adequate training to school district personnel in accordance with the terms of the IDEA Part D grant.

## LEGAL FRAMEWORK

### A.     IDEA and Implementing Regulations

60.     IDEA mandates that the State ensure that "[a] free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled from school." 20 U.S.C. § 1412(a)(1)(A).

61.     IDEA further mandates that the State "establish[] a goal of providing full educational opportunity to all children with disabilities and a detailed timetable for accomplishing that goal."  20 U.S.C. § 1412(a)(2).

62.     In a section entitled "Least Restrictive Environment," IDEA mandates that, "[t]o the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with supplementary aids and services cannot be achieved satisfactorily."   20 U.S.C. § 1412(a)(5)(A).  *See also* 34 C.F.R. § 300.114(a)(2), 300.118; N.J.A.C. 6A:14-4.2(a)(1), (2), (8).

63.     "Supplementary aids and services" are defined as "aids, services, and other supports that are provided in regular education classes or other education-related settings to enable children with disabilities to be educated with non-disabled children to the maximum extent appropriate." 20 U.S.C. § 1401(33).

64.     "Supplementary aids and services" include "specially designed instruction," 20 U.S.C. § 1401(29)(a), positive behavioral interventions and supports, 20 U.S.C. § 1414(d)(3)(B)(i), Braille instruction, 20 U.S.C. § 1414(d)(3)(B)(iii), communication services, 20 U.S.C. § 1414(d)(3)(B)(iv), assistive technology, 20 U.S.C. § 1414(d)(3)(B)(v), and "related services," 20 U.S.C. § 1401(26), which are defined as "developmental, corrective, and other supportive services" and include speech-language pathology and audiology services, interpreting

services, psychological services, physical and occupational therapy, recreation, social work services, school nurse services, counseling services, orientation and mobility services, and medical services, *id.*

65.     Each child with a disability must be "educated in the school that he or she would attend if nondisabled," unless the child's Individualized Education Program ("IEP") requires some other arrangement.  34 C.F.R. § 300.116(c).

66.     An IEP must be developed for each eligible child with a disability and it must contain "academic and functional goals designed to—(aa) meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum."  20 U.S.C. § 1414(d)(1)(A)(i)(II).  The IEP must provide special education, related services and supplementary aids and services that will allow the child to "be involved in and make progress in the general education curriculum," 20 U.S.C. § 1414(d)(1)(A)(i)(IV)(bb) and "be educated and participate with . . . nondisabled children," 20 U.S.C. § 1414(d)(1)(A)(i)(IV)(cc).

67.     The State must ensure that each child with a disability is "not removed from education in age-appropriate regular classrooms solely because of needed modifications in the general curriculum."  34 C.F.R. § 300.116(e).  In addition, removal from the general education classroom may not be based on factors such as "blanket rules regarding the category of disability, severity of disability, and availability of educational or related services. For example, if all students of a particular classification must go to a particular building or class, it is likely to be impermissible. If students who need a particular related service go to where that service is traditionally provided, it is likely to be impermissible."  NJDOE Guidance (May 24, 1999).

68.     IDEA mandates that "in providing or arranging for the provision of nonacademic and extracurricular services and activities, including meals, recess periods, and the services and activities set forth in Sec. 300.107, each public agency must ensure that each child with a disability participates with nondisabled children in the extracurricular services and activities to the maximum extent appropriate to the needs of the child."  34 C.F.R. § 300.117.

*See also* N.J.A.C. 6A:14-4.2(b).  In addition, each child with a disability must "ha[ve] the supplemental aids and services . . . appropriate and necessary for the child to participate in nonacademic settings." *Id.*

69.    Each eligible child's placement must be "as close as possible to the child's home." 34 C.F.R. § 300.116(b)(3); N.J.A.C. 6A:14-4.2(a)(6).

70.    The State Educational Agency must ensure that "a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services." 34 C.F.R. § 300.115(a); N.J.A.C. 6A:14-4.2(a)(3), -4.3(b).

71.    IDEA ensures that "[a] State funding mechanism shall not result in placements that violate the [least restrictive environment] requirements . . . , and a State shall not use a funding mechanism by which the State distributes funds on the basis of the type of setting in which a child is served that will result in the failure to provide a child with a disability a free appropriate public education according to the unique needs of the child as described in the child's IEP." 20 U.S.C. § 1412(a)(5)(B)(i).  *See also* 34 C.F.R. § 300.114(b)(1).

72.    New Jersey's Special Education regulations note that their purpose is to "[e]nsure that students with disabilities are educated in the least restrictive environment." N.J.A.C. 6A:14-1.1(b)(2).  The regulations specifically mandate that each local educational agency "shall have policies, procedures and programs approved by the Department of Education through the county office of education that are in effect to ensure the following: . . . To the maximum extent appropriate students with disabilities are educated in the least restrictive environment." N.J.A.C. 6A:14-1.2(b).

73.    The State Educational Agency must "establish[] and maintain[] qualifications to ensure that personnel necessary to carry out this part are appropriately and adequately prepared and trained, including that those personnel have the content knowledge and skills to serve children with disabilities." 20 U.S.C. § 1412(a)(14)(A).

74.    The State Educational Agency must "adopt a policy that includes a requirement that local educational agencies in the State take measurable steps to recruit, hire,

train, and retain highly qualified personnel to provide special education and related services . . . to children with disabilities."  20 U.S.C. § 1412(a)(14)(D).

75.    The State Educational Agency must provide technical assistance to administrators in all public agencies.  34 C.F.R. § 300.119.

76.    With respect to the Least Restrictive Environment mandate, each State Educational Agency "must carry out activities to ensure that teachers and administrators in all public agencies (a) Are fully informed about their responsibilities for implementing Sec. 300.114 [("General LRE Requirements")]; and (b) Are provided with technical assistance and training necessary to assist them in this effort."  34 C.F.R. § 300.119.

77.    The State Educational Agency is "responsible for general supervision" of education in the state.   20 U.S.C. § 1412(a)(11).  Specifically, the State Educational Agency is responsible for ensuring that the requirements of Section 1412 of IDEA are met, including the right to a free appropriate public education in the least restrictive environment.   20 U.S.C. § 1412(a)(11)(A)(i).  *See also Kruelle v. New Castle County Sch. Dist.*, 642 F.2d 687, 696 (3d Cir. 1981).

78.    In addition, the State Educational Agency is responsible for ensuring that "all educational programs for children with disabilities in the State, including all such programs administered by any other State agency or local agency – (I) are under the general supervision of individuals in the State who are responsible for educational programs for children with disabilities; and (II) meet the educational standards of the State educational agency"   20 U.S.C. § 1412(a)(11)(A)(ii).

79.    The State Educational Agency must "establish[] goals for the performance of children with disabilities in the State that—(i) promote the purposes of [Section 1412 of IDEA]," including the right to a free appropriate public education in the least restrictive environment.  20 U.S.C. § 1412(a)(15)(A).

80.    The State is required to "monitor implementation of," and "enforce," IDEA,  20 U.S.C. § 1416(a)(1)(C), with the "[p]rovision of a free appropriate public education in

the least restrictive environment" being deemed a "monitoring priorit[y]" that requires the collection of data using "quantifiable . . . and . . . qualitative indicators . . . to adequately measure performance," 20 U.S.C. § 1416(a)(3), with "measurable and rigorous targets for the indicators," 20 U.S.C. § 1416(b)(2)(A). The targets must be used by the State to "analyze the performance of each local educational agency in the State in implementing [IDEA]." 20 U.S.C. § 1416(b)(2)(C)(i). *See also* N.J.A.C. 6A:14-9.1.

81. Another "monitoring priorit[y]" for the State Educational Agency is its exercise of its "general supervisory authority" which includes "effective monitoring," 20 U.S.C. § 1416(a)(3)(B). The State Education Agency is to focus its monitoring on "improving educational results and functional outcomes for all children with disabilities." 20 U.S.C. § 1416(a)(2).

82. The "disproportionate representation of racial and ethnic groups in special education" is a state monitoring priority. 20 U.S.C. § 1416(a)(3)(c). The State is also obligated to determine if disproportionate representation of racial and ethnic groups occurs in particular educational placements. 20 U.S.C. § 1418(d)(1)(B).

83. In addition, "each State shall have in place a performance plan that evaluates that State's efforts to implement the requirements and purposes of . . . [IDEA] and describes how the State will improve such implementation." 20 U.S.C. § 1416(b)(1)(A).

84. If in carrying out its monitoring activities, a State Educational Agency has evidence that a public agency is making placements that are inconsistent with the Least Restrictive Environment requirements, it "must—(1) Review the public agency's justification for its actions; and (2) Assist in planning and implementing any necessary corrective action." 34 C.F.R. § 300.120(b).

85. In order to ensure that children are placed in the "least restrictive environment," each placement decision must be "made by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options." 34 C.F.R. § 300.116(a)(1).

86.     The United States Supreme Court has recognized the States' mandate to "educate handicapped[3] children with non-handicapped children whenever possible," *Board of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 202 (1982), and that States must "'mainstream' disabled children, i.e., . . . educate them with children who are not disabled, and . . . segregate or otherwise remove such children from the regular classroom setting 'only when the nature or severity of the handicap is such that education in regular classes . . . cannot be achieved satisfactorily.'" *Honig v. Doe*, 484 U.S. 305, 311 (1988) (citations omitted). *See also School Committee of Town of Burlington v. Department of Educ.*, 471 U.S. 359, 373 (1985) (noting Congress's recognition when passing IDEA's precursor of the "widespread practice of relegating handicapped children to private institutions or warehousing them in special classes").

87.     Local educational agencies must determine whether a child with disabilities can be included in a general education classroom and "'must consider the whole range of supplemental aids and services'" that will make inclusion possible, including "speech and language therapy, special education training for the general education teacher, behavior modification programs, or any other available aids and services appropriate to the child's particular disabilities." *Oberti v. Board of Educ. of the Borough of Clementon*, 995 F.2d 1204, 1216 (3d Cir. 1993). Moreover, schools are required to "make efforts to modify the regular education program to accommodate a disabled child." *Id.* (citing 34 C.F.R. Part 300, App. C. Question 48 (1993)).

88.     The law is well settled that all children with disabilities must be educated with nondisabled peers to the maximum extent appropriate:

(a)     *Oberti* ruled that "IDEA's mainstreaming directive makes clear, Congress understood that a fundamental value of the right to public education for children with

---

[3]     The terms "handicap" and "handicapped," although once commonly used to describe persons with disabilities, have been removed from IDEA and the IDEA regulations, and appear with considerably less frequency elsewhere. The more acceptable terms "disability" and "persons with disabilities" are typically used in their place.

disabilities is the right to associate with nondisabled peers." 995 F.2d at 1216. To determine compliance with the LRE requirement, a court must determine "whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily." *Id.* at 1215 (citations omitted). Meeting this standard requires: (1) taking reasonable steps, including the use of supplementary aids and services and modifying the regular curriculum, to try to include a child in regular classrooms; (2) comparing the educational benefits that a child may receive in the regular classroom *with supplemental aids and services,* including "the development of social and communication skills from interaction with nondisabled peers," and the segregated special education classroom; and, (3) considering the "possible negative effects the child's inclusion might have on the education of other children in the regular classroom." *Id.* at 1217-18. In considering the negative effects, the court must "keep in mind the school's obligation under the Act to provide supplementary aids and services to accommodate the child's disabilities," and the school must still include the child to the maximum extent appropriate. *Id.* at 1217. The *Oberti* Court specifically stated that "[i]f the school has given no serious consideration to including the child in a regular class with such supplementary aids and services and to modifying the regular curriculum to accommodate the child, then it has most likely violated the Act's mainstreaming directive." *Id.* at 1214. Moreover, the Court noted that IDEA "does not permit states to make mere token gestures to accommodate handicapped students; its requirement for modifying and supplementing regular education is broad." *Id.* at 1216 (citation omitted).

       (b)    *T.R. v. Kingwood Township Board of Education*, 205 F. 3d 572 (3d Cir. 2002) held that a general education preschool class in a private daycare center was less restrictive than a public school class composed of fifty percent children with disabilities and fifty percent children without disabilities, and that the child must be educated in the general education classroom with the use of supplementary aids and services, unless it cannot be satisfactorily achieved or where a general education classroom is not available within a reasonable commuting distance of the child.

(c)     *Girty v. School District of Valleygrove*, 163 F. Supp. 2d 527 (W.D.Pa. 2001), *aff'd per curium*, 60 Fed. App. 889 (3d Cir. 2002) held that the full range of supplementary aids and services includes appropriate training for the teachers and aides working with the child, and where training has not been provided, the district has not taken reasonable steps to include the child.

**B.     New Jersey's Special Education Statute**

89.     New Jersey's special education statute states that "it shall be the duty of each board of education to provide suitable facilities and programs of education for all the children who are classified as handicapped."  N.J.S.A. 18A:46-13.

90.     The DOE Commissioner is responsible for the general administration of special education services in the public schools of New Jersey, and must "continually review the operation of the programs of special education."  N.J.S.A. 18A:46-2, -15(b).

**C.     Section 504 and Implementing Regulations**

91.     In enacting the Rehabilitation Act, 29 U.S.C. § 701 *et seq.,* Congress found that disability is a natural part of the human experience, and in no way diminishes the right of individuals to enjoy full inclusion and integration in the economic, political, social, cultural, and educational mainstream of American society, 29 U.S.C. § 701(a)(3)(F), and declared its policy that all programs, projects, and activities receiving assistance under Sector 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504") shall be carried out in a manner consistent with the principles of inclusion, integration, and full participation of the individuals, 29 U.S.C. § 701(c)(3).  In fact, the purpose of Section 504 is to "empower individuals with disabilities to maximize ... inclusion and integration into society,"  29 U.S.C. § 701(b)(1), and the "goals of the Nation" include "providing individuals with disabilities with the tools necessary to . . . achieve full inclusion and integration in society," 29 U.S.C. § 701(a)(6)(B).

92.     Section 504 mandates that no otherwise qualified individual with a disability shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving

federal financial assistance.  29 U.S.C. § 794(a).

93.     A student with a disability is one who has a physical or mental impairment, including a physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organ, respiratory, including speech organs, cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, or endocrine; or a mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities who have, have had, or are perceived to have a physical or mental impairment which substantially limits one or more major life activities. 34 C.F.R. § 104.3(j)(1), (2)(i), (iii), (iv).

94.     Major life activities include: learning, caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, and working.  34 C.F.R. § 104.1(j)(ii).

95.     A student with a disability between the ages of three and twenty-one is an "otherwise qualified individual" under Section 504 for purposes of receipt of educational services.  34 C.F.R. § 104.3(k)(2).

96.     Each student with a disability, regardless of the nature or severity of the disability, shall be provided with a free appropriate public education.  34 C.F.R. § 104.33(a).

97.     An appropriate education under Section 504 is defined as the provision of general or special education and related aids and services that are designed to meet the individual educational needs of children with disabilities as adequately as the needs of nondisabled children are met.  34 C.F.R. § 104.33(b)(1).

98.     Section 504 requires that each student with a disability be provided an education with persons who do not have disabilities to the maximum extent appropriate, and be placed in the general education environment, unless that cannot be achieved satisfactorily.  34 C.F.R. § 104.34(a).

99.     Refusal to include a student with a disability in a regular classroom discriminates against the student in violation of Section 504.  *Oberti*, 801 F. Supp. at 1406.

100.    A recipient shall ensure that the student with a disability participates with nondisabled children to the maximum extent appropriate in nonacademic and extracurricular services and activities, including: meals, recess periods, counseling services, physical and recreational athletics, transportation, health services, recreational activities, special interest groups or clubs sponsored by the recipients, employment of children by the recipient and assistance in making outside employment available. 34 C.F.R. § 104.34(b), 34 C.F.R. § 104.37(a).

101.    If a recipient operates a facility that is identifiable as being for persons with disabilities, the recipient shall ensure that the facility and the services and activities provided are comparable to other facilities, services, and activities of the recipient.  34 C.F.R. § 104.34( c).

102.    The Section 504 regulations do not allow educational placements made out of convenience: "Despite the existence of separate or different . . . services . . . , a recipient may not deny a qualified handicapped person the opportunity to participate in such . . . services that are not separate or different."  34 C.F.R. § 104.4(b)(3).

## D.     New Jersey's Educational Facilities Construction and Financing Act and Implementing Regulations

103.    New Jersey's Educational Facilities Construction and Financing Act mandates that, in every school year ending with a 0 or a 5, "each district shall prepare and submit to the commissioner a long-range facilities plan that details the district's school facilities needs and the district's plan to address those needs for the ensuing five years."  N.J.S.A. 18A:7G-4(a). *See also* N.J.A.C. 6A:26-2.1(a).

104.    An application for a school facilities project "shall not be approved unless the district has filed a long-range facilities plan that is consistent with the application and the

plan has been approved by the [education] commissioner." N.J.S.A. 18A:7G-4(b). *See also* N.J.A.C. 6A:26-2.1(b).

105. "Each district shall determine the number of 'unhoused students' for the ensuing five-year period calculated pursuant to the provisions of section 8 of [the Educational Facilities Construction and Financing Act]." N.J.S.A. 18A:7G-4(f). *See also* N.J.A.C. 6A:26-2.2(b). "Unhoused students are the number of students to be housed in a school building, but which cannot be housed in an existing building without additional space or a new building in order to maintain educational adequacy; or which are temporarily being housed in space that was originally designed or intended for instruction in specialized areas including, but not limited to, science, art, music, other hands-on learning experiences and comprehensive health and physical education." N.J.S.A. 18A:7G-7(a). *See also* N.J.A.C. 6A:26-2.2(b)(1). The number of unhoused students "shall be calculated as the number of [full time equivalent] students who are projected to be enrolled in preschool handicapped, preschool, kindergarten, grades 1 through 12, and special education services pupil educational programs provided in a district within five years, which are in excess of the functional capacity of the district's current school facilities or the functional capacity of the school facilities which will be available within five years other than the school facilities for which the preliminary eligible costs are determined, based upon the district's long-range facilities plan. For the purpose of calculating the district's unhoused students, special education services students shall be considered part of the grade level to which the students' chronological age corresponds." N.J.S.A. 18A:7G-8(a). *See also* N.J.A.C. 6A:26-2.2(b)(1).

106. The Commissioner of Education shall approve "nonconforming spaces[4] upon a determination by the district that the spaces are necessary to comply with State or federal law concerning individuals with disabilities." N.J.S.A. 18A:7G-5(g)(4).

---

[4]     A "nonconforming space" is a space "in excess of, or inconsistent with, the facilities efficiency standards." N.J.S.A. 18A:7G-5(g)(4).

107.   "A district may apply for additional State aid for nonconforming spaces that will permit pupils with disabilities to be educated to the greatest extent possible in the same buildings or classes with their nondisabled peers."  N.J.S.A. 18A:7G-5(g)(4).

108.   "The nonconforming spaces may:  (a) allow for the return of pupils with disabilities from private [or out-of-district] facilities; (b) permit the retention of pupils with disabilities who would otherwise be placed in private [or out-of-district] facilities; (c) provide space for regional programs in a host school building that houses both disabled and non disabled pupils; and (d) provide space for the coordination of regional programs by a county special services school district, educational services commission, jointure commission, or other agency authorized by law to provide regional educational services in a school building that houses both disabled and nondisabled pupils."  N.J.S.A. 18A:7G-5(g)(4).  *See also* N.J.A.C. 6A:26-2.3(d)(2), -3.3(e)(2).

109.   The Commissioner of Education "shall not approve an LRFP [Long Range Facilities Plan] that includes any programmatic models for school facilities that do not meet the facilities efficiency standards unless the district demonstrates that the waiver of the standard or standards will not adversely affect the educational adequacy of the school facility, including the ability to deliver the programs and services necessary to enable all students to achieve the Core Curriculum Content Standards."  N.J.A.C. 6A:26-2.3(f).

**E.      New Jersey's Professional Licensing Standards**

110.   The State Board of Education established rules, the purpose of which "is to establish a licensure system based on professional standards for pre-service preparation, certification and professional development that continuously serves to improve the quality of instruction for New Jersey's children so that they are equipped to work and succeed in an ever-changing and increasingly complex global economy.  A standards-based, rigorous system of licensure, designed to support improved student achievement of the Core Curriculum Content Standards will serve to improve the quality of the New Jersey educator workforce and to improve student performance."  N.J.A.C. 6A:9-1.2.

111.    The State Board's Professional Standards for Teachers and School Leaders[5] require teachers to "adapt and modify instruction to accommodate the special learning needs of all students" and further require teachers to "engage in activities to . . . [p]articipate in the design and implementation of the Individualized Education Program (IEP), where appropriate."  N.J.A.C. 6A:9-3.3(a)(7)(iii)(3).

112.    Similarly, school leaders are required to be "committed to . . . the educability of all" and "[t]he inclusion of all members of the school community."  N.J.A.C. 6A:9-2.1, 6A:9-3.4(a)(1)(ii)(1) and (4).  School leaders must also be "committed to . . . the right of every student to a free, quality education" and must "facilitate processes and engage in activities ensuring that they . . . [f]ulfill legal and contractual obligations . . . and . . . [a]pply laws and procedures fairly, wisely and considerately."  N.J.A.C. 6A:9-3.4(a)(5)(iii)(15) and (16).

113.    A district board of education may only employ a provisional teacher if it has an approved "mentoring plan" that must include formal instruction that is "aligned with the Professional Standards for Teachers."  N.J.A.C. 6A:9-8.3(a), (b)(4).  The Professional Standards require that teachers "adapt and modify instruction to accommodate the special learning needs of all students" and further require teachers to "engage in activities to . . . [p]articipate in the design and implementation of the Individualized Education Program (IEP), where appropriate."  N.J.A.C. 6A:9-3.3(a)(7)(iii)(3).

**F.     New Jersey's Law Against Discrimination**

114.    The New Jersey Law Against Discrimination ("LAD") states that "[a]ll persons shall have the opportunity to . . . obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation . . . without discrimination because of . . . disability."  N.J.S.A. 10:5-4.

---

[5]      A "school leader" is defined as "an administrator whose position requires possession of a school administrator, principal, or supervisor endorsement." N.J.A.C. 6A:9-2.1.

115.    "A place of public accommodation" as defined by LAD includes "any kindergarten, primary and secondary school . . . high school, academy, . . . or any educational institution under the supervision of the State Board of Education, or the Commissioner of Education of the State of New Jersey." N.J.S.A. 10:5-5(l).

116.    A "disability" is defined as any "physical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness including epilepsy and other seizure disorders, and which shall include, but not be limited to, any degree of paralysis, amputation, lack of physical coordination, blindness or visual impediment, deafness or hearing impediment, muteness or speech impediment or physical reliance on a service or guide dog, wheelchair, or other remedial appliance or device, or any mental, psychological or developmental disability resulting from anatomical, psychological, physiological or neurological conditions which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques." N.J.S.A. 10:5-5(q).

117.    It is a violation of LAD "[f]or any owner, lessee, proprietor, manager, superintendent, agent, or employee of any place of public accommodation directly or indirectly to refuse, withhold from or deny to any person any of the accommodations, advantages, facilities or privileges thereof, or to discriminate against any person in the furnishing thereof, . . . on account of the . . . disability . . . of such person." N.J.S.A. 10:5-12(f)(1).

## CLAIMS

### FIRST CAUSE OF ACTION
**(Special Education Law)**

118.    Plaintiffs repeat and reallege the allegations contained in each of the forgoing paragraphs above as though fully set forth herein.

119.    Defendants have violated Plaintiffs' rights under the Individuals with Disabilities Education Improvement Act, 20 U.S.C. §§ 1400 *et seq.*, and its implementing

regulations at 34 C.F.R. Part 300 and N.J.A.C.  6A:14, and New Jersey's Special Education Statute, N.J.S.A. 18A:46-1*et seq.*, by:

(a)    failing to provide children with disabilities with a free appropriate public education in the least restrictive environment;

(b)    failing to provide children with disabilities with appropriate supplemental aids, services, and accommodations in general education classrooms;

(c)    denying children with disabilities access to specially designed instruction and related services in general education classrooms, based on availability of services, extent or nature of the disability, configuration of the service delivery system, lack of teacher training, lack of available of space and other considerations that are unrelated to the needs of the child;

(d)    failing to institute a comprehensive system of personnel development and professional licensure standards which ensure that general education and special education personnel are trained and monitored in providing children with disabilities an inclusive education and the use of supplementary aids and services in general education classrooms;

(e)    failing to offer a full continuum of services, including specialized instruction and other supplementary aids and services in general education classrooms;

(f)    failing to provide children with disabilities with IEPs that confer real educational benefits;

(g)    failing to afford children with disabilities the opportunity to participate in academic and extra-curricular programs to the same extent as, and alongside, their non-disabled peers;

(h)    denying children with disabilities the opportunity to attend the neighborhood schools they would have attended if they did not have a disability;

(i)    maintaining state funding formulas that impede the mandated inclusion of children with disabilities;

(j)      failing to appropriately and effectively monitor school district compliance with special education mandates and ensure timely correction of noncompliance once identified;

(k)      approving the development of school facilities that impede the inclusion of children with disabilities;

(l)      approving district Long Range Facilities Plans that include models for school facilities that impede the inclusion of children with disabilities;

(m)      denying district applications for additional aid for "nonconforming spaces" which would allow children with disabilities to be included in general education programs; and

(n)      failing to provide sufficient, effective technical assistance and training to districts in the provision of inclusive education services.

### SECOND CAUSE OF ACTION
#### (Section 504)

120.      Plaintiffs repeat and reallege the allegations contained in each of the forgoing paragraphs above as though fully set forth herein.

121.      Defendants have violated Plaintiffs' rights under Section 504 of the Rehabilitation Act , 29 U.S.C. § 794, and the regulations promulgated pursuant thereto, 45 C.F.R. part 84 and 34 C.F.R. part 104, by:

(a)      denying children with disabilities the opportunity to participate in, and benefit from, general education services, including academic and nonacademic services and school activities;

(b)      failing to adapt and modify general education classroom activities to meet the individual needs of children with disabilities;

(c)      failing to provide children with disabilities with an equal opportunity to participate in, and benefit from, Defendants' services;

(d)     failing to provide children with disabilities with educational and other services that are as effective as the services provided other children, including those without disabilities;

(e)     providing different and separate services to children with and without disabilities;

(f)     denying children with disabilities, solely on the basis of the severity of their disabilities, the benefits of federally assisted educational programs;

(g)     denying children with disabilities appropriate services based on available services, lack of accessible space and other considerations unrelated to the needs of the child;

(h)     segregating children with disabilities due to their disabilities;

(i)     aiding and perpetuating, as a result of their disabilities, discrimination against children in federally-funded programs;

(j)     limiting enjoyment of the right and opportunity to receive a free appropriate public education for children with disabilities;

(k)     failing to provide children with disabilities with, where necessary, specialized instruction, adaptations and accommodations in the general education classroom; and

(l)     failing to assign children with disabilities to general educational programs with supplementary aids and services when they could benefit from those programs.

### THIRD CAUSE OF ACTION
**(New Jersey Law Against Discrimination)**

122.    Plaintiffs repeat and reallege the allegations contained in each of the forgoing paragraphs above as though fully set forth herein.

123.    Defendants are denying Plaintiffs, on account of Plaintiffs' disabilities, the accommodations, advantages, facilities, and privileges of a "place of public accommodation," *viz.* educational institutions.

124.   Defendants have thus violated, and are continuing to violate, Plaintiffs' rights under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, *et seq.*

## RELIEF REQUESTED

**WHEREFORE,** Plaintiffs respectfully request the entry of judgment in their favor and granting the following relief:

I.   Declaring, pursuant to 28 U.S.C. § 2201, that Defendants have violated Plaintiffs' rights, as set forth above;

II.   Permanently enjoining, ordering, and requiring Defendants to perform the following for Plaintiffs:

(a)   educate children with disabilities in the "least restrictive environment," that is, to the maximum extent appropriate, with children who do not have disabilities;

(b)   allow children with disabilities to participate in academic and non-academic programs to the same extent that their non-disabled peers participate;

(c)   educate children with disabilities in the neighborhood school the children would have attended if they did not have disabilities;

(d)   establish a continuum of placement for children with disabilities;

(e)   implement funding formulas that facilitate inclusion of children with disabilities;

(f)   provide, and mandate for district personnel, comprehensive personnel development in general and special education;

(g)   revise professional licensure standards to mandate special education training for all teachers;

(h)     obtain, and then provide to all district personnel, sufficient and effective technical assistance and training in the implementation of inclusive education practices;

(i)     monitor district compliance with federal and state education laws and ensure timely correction of noncompliance once identified;

(j)     develop school facilities that enhance inclusion of children with disabilities;

(k)     oversee the review of IEPs of all children with disabilities to ensure that they are being educated in the least restrictive environment; and

(l)     such other actions as are required to educate children in the least restrictive environment;

III.    Appointing a special master to oversee the monitoring of inclusion by local school districts;

IV.    an award of costs and attorney's fees pursuant to 20 U.S.C. § 1415(i)(2) and N.J.S.A. 10:5-27.1; and

V.    such other relief as this Court deems appropriate.

Respectfully submitted,

**LOWENSTEIN SANDLER** P C

**By:**     /s/ David L. Harris       
      David L. Harris
      Stephen M. Plotnick

**EDUCATION LAW CENTER**
By:  Ruth Lowenkron

**NEW JERSEY PROTECTION & ADVOCACY, INC.**
By:  Sarah Wiggins Mitchell
      Joseph B. Young

**LOUGHLIN & LATIMER**
By:  Michaelene Loughlin

*Attorneys for Plaintiffs*

Dated: June 27, 2007

## <u>VERIFICATION AND CERTIFICATIONPURSUANT TO L. Civ. R. 11.2</u>

I hereby verify that, to the best of my knowledge, information and belief formed after a reasonable inquiry, this action is not being presented for any improper purpose; the claims defenses and other legal contentions are warranted by existing law; and the allegations and factual contentions have evidentiary support.

    /s/ David L. Harris         
David L. Harris

I hereby certify that the matter in controversy is not the subject of any other court, arbitration or administrative proceeding, except similar issues are raised in *Grieco, et al. v. New Jersey Department of Education, et al.* Civil Action No. 06-CV-04077 (PGS-RJH) (D.N.J.).

    /s/ David L. Harris         
David L. Harris
